JS 44   (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff _____ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____ <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☐ 2  U.S. Government
    Defendant

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☐ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury <br> ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br><br> **INTELLECTUAL PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated New Drug Application <br> ☐ 840 Trademark <br> ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC 3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit (15 USC 1681 or 1692) <br> ☐ 485 Telephone Consumer Protection Act <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> ☐ 463 Alien Detainee <br> ☐ 510 Motions to Vacate Sentence <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> **Other:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - Conditions of Confinement | **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Management Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement Income Security Act <br><br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 465 Other Immigration Actions | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br><br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    Another District
    *(specify)*

☐ 6 Multidistrict
    Litigation -
    Transfer

☐ 8 Multidistrict
    Litigation -
    Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions.)*

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia  ▾

| | |
|---|---|
| ANDREW MONTGOMERY | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| ABSECON CAPITAL, INC; | ) |
| KOOK BURGER AND BAR LLC, | ) |
| BLACK TURTLE COFFEE LLC, | ) |
| and DOES 1– 10 | ) |
| | ) |
| _Defendant(s)_ | ) |

Civil Action No.

### SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  ABSECON CAPITAL, INC., 2102 Market St., Philadelphia, PA 19103
KOOK BURGER AND BAR LLC,  3101 Revere Blvd., Brigantine, NJ, 08203
BLACK TURTLE COFFEE LLC, 2100 Chestnut St., Fl. 1, Philadelphia, PA, 19103

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you
are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ.
P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of
the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney,
whose name and address are:

Mohaimina Haque, Esq.
The Law Office of Mohaimina Haque, PLLC
1629 K St NW #300
Washington, DC 20006

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.
You also must file your answer or motion with the court.

_ANGELA D. CAESAR, CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ __0.00__ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ANDREW MONTGOMERY,
                                    Plaintiff,

              - against –

ABSECON CAPITAL, INC;
KOOK BURGER AND BAR LLC,
BLACK TURTLE COFFEE LLC,
UNKNOWN CORPORATIONS XYZ, and
DOES 1–10,
                                    Defendants.

Case No.:

**COMPLAINT**

1.      Plaintiff, Andrew Montgomery, by and through counsel, brings this Complaint against Defendants Absecon Capital, Inc. ("Absecon"), Kook Burger and Bar LLC ("Kook Burger"), and Black Turtle Coffee LLC ("Black Turtle") (collectively, "Defendants") for damages and declaratory relief arising from fraudulent misrepresentations, breaches of a Simple Agreement for Future Equity (SAFE), violations of the District of Columbia Consumer Protection Procedures Act (CPPA), and violations of federal securities laws. Plaintiff alleges as follows:

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) due to complete diversity of citizenship between Plaintiff, a resident of Washington, D.C., and Defendants, corporations and LLCs incorporated in Delaware with principal places of business in Philadelphia, Pennsylvania. The amount in controversy exceeds $75,000. Additionally, this Court has federal question jurisdiction under 28 U.S.C. § 1331 for claims arising under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

3.    This Court has personal jurisdiction over Defendants because they purposefully directed their activities toward the District of Columbia by negotiating and executing the SAFE Agreement for Future Equity ("SAFE Agreement") here, conducting meetings and communications with Plaintiff in the District, and targeting Plaintiff, a D.C. resident, for investment.

4.    Venue is proper under 28 U.S.C. § 1391(b)(1) as Plaintiff resides in the District of Columbia at 1300 4th St. SE #904, Washington, D.C. 20003, and under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims, including the negotiation, execution, and misrepresentations related to the SAFE Agreement, occurred in the District of Columbia.

## PARTIES

5.    Plaintiff Andrew Montgomery is an individual investor residing at 1300 4th St. SE #904, Washington, D.C. 20003.

6.    Defendant Absecon Capital, Inc. is a Delaware Domestic Corporation (File Number 6367321), incorporated on November 5, 2021, with its principal place of business in Philadelphia, Pennsylvania, and a registered agent at Vcorp Services, LLC, 1013 Centre Road Suite 403 B, Wilmington, DE 19805.

7.    Defendant Kook Burger and Bar LLC is a Delaware limited liability company (File Number 2613189), with a registered agent at the same address, formed to facilitate Kook Burger's expansion into New York.

8.    Defendant Black Turtle Coffee LLC is a Delaware limited liability company, with a registered agent at the same address, operating premium coffee locations.

9.      Absecon owns and manages a hospitality portfolio, including Kook Burger, Black Turtle, and other companies, and exercises control over Kook Burger and Black Turtle as part of the same joint enterprise or corporate alter ego. Absecon and all of its portfolio companies are owned and co-founded by Kingsley Braeden Anderson ("Anderson") and Selena Gabrielle ("Gabrielle").

## FACTUAL ALLEGATIONS

10.      On April 25, 2024, Plaintiff entered into a SAFE Agreement with Absecon, investing $250,000 (the "Investment Amount") to fund the expansion of Black Turtle and Kook Burger, including new locations, equipment Investments, and marketing (Exhibit 1: SAFE Agreement).

11.      Shortly after Plaintiff's $250,000 investment on April 25, 2024, Defendants, through Anderson and Gabrielle, misappropriated significant company funds for personal use, including mortgages, a yacht, and undisclosed distributions, as evidenced by their financial mismanagement and creditor correspondence by February 2025. This misappropriation, occurring within months of the investment, depleted the funds intended for expansion, breaching the SAFE's obligation to use the Purchase Amount for business purposes under Sections 1(a) and 1(c).

12.      The SAFE Agreement required that, in an Equity Financing (Section 1(a)), the Investment Amount would convert into SAFE Preferred Stock based on a Conversion Price, with Plaintiff executing related transaction documents (Section 1(b)).

13.      In a Liquidity Event (Section 1(c)), Plaintiff was entitled to the greater of the Cash-Out Amount ($250,000) or a Conversion Amount based on the Liquidity Price.

14.     In a Dissolution Event (Section 1(d)), Plaintiff was entitled to the Cash-Out Amount. The liquidation priority (Section 1(e)) placed Plaintiff's rights junior to creditors but senior to Common Stock.

15.     The SAFE, governed by Delaware law under Section 5(f) without regard to conflicts of law provisions, provided Plaintiff with rights to future equity at a $30,000,000 Valuation Cap with a 15% Discount Rate upon certain events, and obligated Defendants to use the funds for business purposes as represented.

16.     Section 5(g) intended the SAFE to be characterized as common stock for tax purposes, and Section 5(i) imposed a 180-day lock-up on share transfers post-Initial Public Offering, Direct Listing, or SPAC Transaction.

17.     Defendants, through their co-founders Kingsley Braeden Anderson and Selena Gabrielle, represented under Section 3(b) that the SAFE's execution was duly authorized and enforceable, and under Section 3(c) that its performance would not violate material judgments, accelerate debt, or impose liens, nor result in the suspension of material permits.

18.     In 2021, Black Turtle, a predecessor entity whose operations were assumed by Absecon, issued offering memoranda under Regulation Crowdfunding, seeking $25,000–$106,000 for equipment, supplies, rent, and advertising for Black Turtle. (Exhibit 3: Form C Filing)

19.     These memoranda, prepared by Anderson and Gabrielle, falsely represented:

a.  Black Turtle had no indebtedness outside crowdfunding debt.

b.  The company projected operating profits of $349,369–$553,773 over five years.

c. The company planned to capture the premium coffee market with online sales, subscriptions, and a physical location in Brigantine, NJ.

20.     On October 27, 2021, Black Turtle filed a Form C-W with the SEC, withdrawing the crowdfunding offering, such that no securities were issued pursuant to the memoranda. However, Defendants continued to solicit investments using similar representations through their website (https://absconcap.com/investment-opportunities), promoting investment opportunities in Black Turtle and Kook Burger, even as they faced operational challenges (Exhibit 9:  Investment Opportunities Website).

21.     In early-2024, Anderson presented a slide to Plaintiff stating that Defendants had definitive plans to expand Black Turtle and Kook Burger to Boston, Austin, Las Vegas, Atlanta, Miami, Houston, Chicago, and West Palm Beach, with location scouting already underway and no additional capital needed (Exhibit 4: Anderson Slide Presentation).

22.     During the investment pitch, Plaintiff specifically inquired whether these expansion plans were dependent on the Plaintiff's Investment Amount, and Anderson assured Plaintiff that the expansion plans were already underway and did not require additional capital at that time, a representation Plaintiff relied upon in making the investment

23.     Consistent with Anderson's slide, between March and April 2024,Defendants, through Anderson and Gabrielle, made additional representations to induce Plaintiff's investment:

a. Anderson claimed he was fully committed to the business, having quit practicing law to focus on its success, and was "all-in" with his drive and hustle.

b.  Anderson stated that the founders, himself and Gabrielle, did not take a salary or consistent distributions, as they were committed to growing the company and living off savings from previous employment, with Anderson reiterating in May 2024 that he occasionally took distributions but did not need many due to prior earnings as a lawyer.

c.  Defendants had definitive plans to expand Black Turtle and Kook Burger to the cities listed in the slide, with location scouting already underway.

d.  All existing locations were profitable with high margins, supported by income statements shown to Plaintiff, with Anderson claiming the landlord wanted to invest due to "never hearing of making these kinds of margins" on coffee.

e.  The Company had minimal debt, limited to founder loans from Anderson and Gabrielle.

f.  Franchise plans and a "black card" customer loyalty program were actively being developed, with Anderson soliciting investor input on pricing models.

g.  Anderson was constantly meeting with potential large wholesale accounts to grow the business.

24.     Plaintiff relied on these representations, , the 2024 slide presentation, the April 2024 public announcement of the New York expansion, and Absecon Captial investment opportunities website, which were material to his decision to invest $250,000 on April 25, 2024, and would not have invested without them.

25.     Defendants publicly announced New York expansion for Kook Burger through Kook Burger and Bar NYC LLC, publicized in April 2024, did materialize briefly, but By February 20, 2025, Black Turtle (3101 Revere Blvd., Unit A, Brigantine, NJ) and

Kook Burger (3101 Revere Blvd., Unit B, Brigantine, NJ) received eviction notices from the Superior Court of New Jersey, Atlantic County, and closed, with new businesses set to occupy the spaces by May 1, 2025 (Exhibit 5: Black Turtle Eviction Notice; Exhibit 6: Kook Burger Eviction Notice; https://973espn.com/eviction-notices-shake-brigantines-dining-scene-kook-burger-black-turtle-coffee/). Anderson claimed that the landlord breached the lease, but took no action to pursue remedies.

26.     Defendants allowed Anderson and Gabrielle to withdraw funds to be used for personal use, such as mortgages and a yacht, rather that utilizing those funds for business purposes and following the provisions of the SAFE .

27.     Defendants failed to pursue expansion, closing existing locations instead of opening new ones, despite assurances that location scouting was underway and not dependent on the Plaintiff's Investment Amount, a representation central to Plaintiff's reliance.

28.     Defendants concealed substantial debt, including high-interest loans from early investors misclassified as founder contributions, contrary to the claim of minimal debt.

29.     Defendants falsely claimed profitability, as locations were not generating the represented margins or projected profits, with income statements later shown to be fabricated.

30.     Defendants never pursued franchise plans, the "black card" program, or wholesale accounts, which were fictional, despite Anderson's claims of active development and meetings.

31.    Defendants resisted Plaintiff's proposals to form a board of directors, which would have ensured oversight and accountability, breaching promises of transparent governance.

32.    On several occasions, as Defendants' financial troubles became apparent, Plaintiff suggested to Anderson that Defendants seek an SBA loan, but Anderson refused, claiming "they won't give us any money," likely because honest financial statements, which he could not produce, would be required.

33.    Additionally, despite claims of not taking a salary or consistent distributions, Anderson and Gabrielle took significant distributions, further depleting company funds.

34.    Defendants engaged in gross financial mismanagement, incurring significant overdraft fees, failing to maintain accurate financial records (including an incomplete debt schedule and untraceable loan deposits, e.g., a $300,000 loan on April 27, 2024, not reflected in company accounts), facing evictions in Brigantine, and facing lawsuits for unpaid wages (*Rodriguez v. Absecon Capital, Inc.*, Docket No. ATL-L-000233-25, filed February 5, 2025)(Exhibit 7), unpaid contractual debts (*Frankel and Rubinson v. Absecon Capital and Black Turtle Coffee LLC*, Docket No. ATL-L-000168-25, filed January 27, 2025)(Exhibit 8)  and (*Interstate  Outdoor Advertising. LP v. Black Turtle Coffee, LLC, et al*, Docket No. ATL-L-001185-24, filed 06/05/2024) (Exhibit 9), further evidencing their operational and financial collapse, a direct result of the breaches of the SAFE Agreement, and the misappropriation of funds—including the Plaintiff's Investment Amount—by Anderson and Gabrielle

35.     Defendants' failure to invest in expansion, coupled with closures of existing units, additional legal actions against them, and a misappropriation of Plaintiff's $250,000 investment, resulting in a total loss of the investment and no equity value, breaching Sections 1(a), 1(c), 1(d), and 5(i) of the SAFE.

36.     On April 22, 2025, Plaintiff sent a demand letter to Defendants requesting an accounting of the funds and repayment of the Investment Amount.

37.     On April 28, 2025, Anderson, acting in his personal capacity, responded with a Notice of Bankruptcy (Exhibit 2), referencing his and Gabrielle's Chapter 13 bankruptcy filing (Case No. 25-14279, filed April 24, 2025), without providing an accounting or addressing repayment, further evidencing Defendants' bad faith and abandonment of their obligations.

38.     Defendants' actions, through Anderson and Gabrielle, including the non-substantive response to the demand letter, were intentional, designed to deceive Plaintiff and procure the investment under false pretenses, causing significant financial harm.

39.     The bankruptcy filing by Anderson and Gabrielle triggers an automatic stay under 11 U.S.C. § 362(a) applicable to them (Exhibit 2: Notice of Bankruptcy Filing).

40.     Defendants, Absecon Capital, Inc., Kook Burger and Bar LLC, and Black Turtle Coffee LLC, are not debtors in that bankruptcy, and no stay applies to claims against them. Claims against Defendants may be non-dischargeable in the individuals' bankruptcy under 11 U.S.C. § 523(a)(2)(A) and (a)(4) for fraud and breach of fiduciary duty.

41.     While Delaware law governs the SAFE Agreement pursuant to Section 5(f), the Court should apply D.C. law to the fraud (Count I) and CPPA (Count V) claims due to

the transaction's location in the District of Columbia, and federal law to the securities fraud

claim (Count VI), with a request for a declaratory judgment to resolve any conflicts.

## COUNT I: FRAUD/MISREPRESENTATION

42.    Plaintiff incorporates paragraphs 1–41.

43.    Defendants, through Anderson and Gabrielle, knowingly made false

representations in the 2021 offering memoranda (Exhibit 3), the 2024 slide presentation

(Exhibit 4), the April 2024 public announcement of the New York expansion, the Absecon

Capital investment opportunities website (Exhibit 10), and 2024 communications about

Anderson's commitment, executive salaries, expansion plans, debt structure, profitability,

franchise plans, customer programs, wholesale accounts, and business plans to induce

Plaintiff's investment, breaching the SAFE's implied duty under Section 3(b) to ensure

enforceability and Section 3(c) to avoid material violations, including the immediate

misappropriation of funds for personal use shortly after the Plaintiff's Investment of

$250,000, evidencing intent to deceive.

44.    Plaintiff justifiably relied on these representations, investing $250,000 on

April 25, 2024, then allowed Anderson and Gabrielle immediately misappropriate for

personal use shortly thereafter.

45.    Defendants' failure to use the funds as represented, coupled with the closure

of locations by February 20, 2025, and misappropriation of funds, directly caused

Plaintiff's loss of $250,000.

## COUNT II: BREACH OF CONTRACT

46.    Plaintiff incorporates paragraphs 1–45.

47.    The SAFE Agreement (Exhibit 1), executed on April 25, 2024, constituted a valid and enforceable contract under Delaware law (Section 5(f)), requiring Defendants to use the $250,000 for Black Turtle and Kook Burger expansion and to convert the Investment Amount into SAFE Preferred Stock upon an Equity Financing (Section 1(a)), pay the Cash-Out Amount or Conversion Amount in a Liquidity Event (Section 1(c)), or pay the Cash-Out Amount in a Dissolution Event (Section 1(d)), with liquidation priority as specified (Section 1(e)).

48.    Defendants breached this contract by failing to pursue an Equity Financing or Liquidity Event, allowing a Dissolution Event through closures by February 20, 2025 without payment, and instead misappropriating a significant amount of company funds for personal use—mortgages, a yacht, and undisclosed distributions—shortly after the Investment, violating Sections 1(a), 1(c), 1(d), and 1(e) in that they:

h.    Failed to pursue an Equity Financing (Section 1(a)) or Liquidity Event (Section 1(c)), such as an Initial Public Offering, Direct Listing, SPAC Transaction, or Change of Control, as no such events occurred, preventing conversion of the Investment Amount into SAFE Preferred Stock or payment of the Conversion Amount, resulting in a total loss of Plaintiff's Investment Amount.

i.    Allowed a Dissolution Event (Section 1(d)) through the voluntary termination of operations and closures of Black Turtle and Kook Burger by February 20, 2025, without paying Plaintiff the Cash-Out Amount of $250,000, violating the liquidation priority (Section 1(e)) which entitled Plaintiff to payment.

49.    Defendants further:

j.   Violated Section 3(b)'s representation that the SAFE was duly authorized and enforceable, as Defendants' subsequent mismanagement and abandonment rendered it unenforceable, breaching their duty to perform.

k.   Breached Section 3(c)'s representation that performance would not violate material judgments, accelerate debt, or impose liens, as evictions (Exhibits 5 and 6) and lawsuits (Exhibits 7 and 8) indicate violations of material contracts and the imposition of liens, accelerating debt obligations.

l.   Undermined Section 5(g)'s intent to characterize the SAFE as common stock for tax purposes, as the company's collapse and misappropriation of funds jeopardized this tax treatment, potentially exposing Plaintiff to tax liabilities or loss of benefits.

m.   Failed to achieve conditions for Section 5(i)'s lock-up provision, as no Initial Public Offering, Direct Listing, or SPAC Transaction occurred, rendering the equity rights worthless due to Defendants' abandonment.

50.    Plaintiff suffered damages of $250,000, plus lost equity opportunities, as a direct result of this breach.

## COUNT III: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

51.    Plaintiff incorporates paragraphs 1–50.

52.    The SAFE Agreement included an implied covenant of good faith and fair dealing under Delaware law (Section 5(f)), obligating Defendants to act in a manner that preserved Plaintiff's contractual benefits, including the right to conversion and payment under Sections 1(a), 1(c), and 1(d).

53.    Defendants breached this covenant by allowing funds to be misappropriated, abandoning expansion plans announced in April 2024, and ceasing

operations by February 20, 2025, depriving Plaintiff of business growth and equity rights under the SAFE.

54.     Plaintiff suffered damages of $250,000 as a result.

### COUNT IV: BREACH OF FIDUCIARY DUTY

55.     Plaintiff incorporates paragraphs 1–54.

56.     Defendants owed Plaintiff a fiduciary duty under Delaware law (Section 5(f)) to manage the $250,000 investment in good faith for the agreed-upon business purposes, given their control over the funds and representations of transparency by Anderson and Gabrielle, as reinforced by Section 3(b)'s duty to ensure enforceability.

57.     Defendants breached this duty—and the duty of loyalty—by misappropriating funds for personal benefit, resisting board formation, taking undisclosed distributions, and abandoning operations, as evidenced by the February 20, 2025, closures and subsequent lawsuits (Exhibits 5-9), violating Section 3(c)'s representation against material violations.

58.     Plaintiff suffered damages of $250,000 as a result.

### COUNT V: VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT (CPPA)

59.     Plaintiff incorporates paragraphs 1–58.

60.     Defendants' false representations, through Anderson and Gabrielle, in the 2021 offering memoranda (Exhibit 3), the 2024 slide presentation (Exhibit 4), the April 2024 public announcement of the New York expansion, the investment opportunities website (Exhibit 10), and 2024 communications about Anderson's commitment, executive salaries, expansion plans, debt structure, profitability, franchise plans, customer programs, wholesale accounts, and business plans, made to induce Plaintiff's investment, constitute

deceptive trade practices under D.C. Code § 28-3904(a) (misrepresentation of material fact), (e) (false statement of fact), and (f) (failure to state material fact).

61.    Plaintiff, an individual investor seeking personal financial gain, qualifies as a consumer under the CPPA, having engaged in a transaction with Defendants for investment purposes in the District of Columbia.

62.    The deceptive practices occurred in the course of trade or commerce in the District of Columbia, during SAFE negotiations and execution.

63.    Plaintiff suffered damages of $250,000 as a direct result, entitling Plaintiff to treble damages, punitive damages, attorneys' fees, and costs under D.C. Code § 28-3905(k)(1).

### COUNT VI: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5

64.    Plaintiff incorporates paragraphs 1–63.

65.    Defendants, through Anderson and Gabrielle, made false and misleading statements in the 2021 offering memoranda (Exhibit 3), the 2024 slide presentation (Exhibit 4), the April 2024 public announcement of the New York expansion, the investment opportunities website (Exhibits 9 and 10), and 2024 communications about Anderson's commitment, expansion plans, debt structure, profitability, franchise plans, customer programs, and wholesale accounts in connection with the sale of the SAFE, a security under federal law, breaching Section 5(g)'s intent to characterize it as common stock.

66.    These misrepresentations were material, as they influenced Plaintiff's decision to invest $250,000 on April 25, 2024, and were made with scienter, as Defendants

knew or recklessly disregarded their falsity, especially given the subsequent closures by February 20, 2025.

67.    Plaintiff justifiably relied on these misrepresentations, suffering damages of $250,000 when the investment was lost due to Defendants' failure to pursue an Equity Financing, Liquidity Event, or avoid a Dissolution Event, breaching Sections 1(a), 1(c), 1(d), and 5(i).

68.    Defendants' actions violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), entitling Plaintiff to damages and rescission.

## PRAYER FOR RELIEF

n.  Plaintiff respectfully requests:

o.  Rescission of the SAFE Agreement, canceling all obligations thereunder.

p.  Restitution of the $250,000 invested by Plaintiff.

q.  Compensatory damages of $250,000, plus prejudgment and post-judgment interest, for losses incurred due to Defendants' breaches and violations.

r.  Treble damages under the CPPA, D.C. Code § 28-3905(k)(1), or $1,500 per violation, whichever is greater.

s.  Punitive damages for Defendants' willful and deceptive conduct.

t.  Attorneys' fees and costs under the CPPA, D.C. Code § 28-3905(k)(1), and other applicable laws.

u.  A declaratory judgment determining that Delaware law applies to Counts II, III, and IV, D.C. law applies to Counts I and V, and federal law applies to Count VI, resolving any conflicts of law.

v.   Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

**Respectfully submitted**,
Mohaimina Haque
The Law Office of Mohaimina Haque, PLLC
1629 K St NW #300
Washington, DC 20006
(202) 355-6384
mina@attorneymina.com
Counsel for Plaintiff

**Exhibits**:

- Exhibit 1: SAFE Agreement (April 25, 2024)
- Exhibit 2: Notice of Bankruptcy Filing (Case No. 25-14279, April 24, 2025)
- Exhibit 3: Black Turtle Coffee Offering Memorandum, Form C (2021, withdrawn October 27, 2021)
- Exhibit 4: Anderson Slide Presentation (2024)
- Exhibit 5: Eviction Notice for Black Turtle Coffee (February 20, 2025)
- Exhibit 6: Eviction Notice for Kook Burger (February 20, 2025)
- Exhibit 7: Complaint in *Rodriguez v. Absecon Capital, Inc.*, Docket No. ATL-L-000233-25 (February 5, 2025)
- Exhibit 8: Complaint in *Frankel and Rubinson v. Absecon Capital and Black Turtle Coffee LLC*, Docket No. ATL-L-000168-25 (January 27, 2025)
- Exhibit 9: Final Judgment by Default and Taxing of Costs in *Interstate Outdoor Advertising. LP v. Black Turtle Coffee, LLC, et al*, Docket No. ATL-L-001185-24 (April 28, 2025)
- Exhibit 10: Investment Opportunities Website (https://abseconcap.com/investment-opportunities)

# EXHIBIT 1

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAW AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED WITHOUT EFFECTIVE REGISTRATIONS THEREUNDER OR AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATIONS ARE NOT REQUIRED.

## ABSECON CAPITAL, INC.

### PRE-MONEY SAFE
*(Valuation Cap + Discount)*

THIS CERTIFIES THAT in exchange for the payment by Andrew Montgomery (the "Investor") of $250,000 (the "Purchase Amount") on or about April 25, 2024, Absecon Capital, Inc., a Delaware corporation (the "Company"), hereby issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms set forth below.

The "Valuation Cap" is $30,000,000.

The "Discount Rate" is 85% (so the discount is 15%).

See Section 2 for certain additional defined terms.

1. **Events.**

    (a)    **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument (this "SAFE"), on the initial closing of such Equity Financing, this SAFE will automatically convert into the number of shares of SAFE Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

    (b)    In connection with the issuance of SAFE Preferred Stock by the Company to the Investor pursuant to this Section 1(a), the Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the SAFE Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor.

    (c)    **Liquidity Event**.  If there is a Liquidity Event before the termination of this SAFE, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "Cash-Out Amount") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "Conversion Amount").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, provided that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

    Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total

Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(d)     **Dissolution Event**. If there is a Dissolution Event before the termination of this SAFE, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(e)     **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this SAFE is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

(i)     Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)     *Pari passu* with payments for Other SAFEs and/or the most recent series of Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such Other SAFEs and/or the most recent series of Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such Other SAFEs and/or the most recent series of Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)     Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and Other SAFEs and/or the most recent series of Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(f)     **Termination**.  This SAFE will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this SAFE) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this SAFE under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.     **Definitions.**

"Capital Stock" means the capital stock of the Company, including, without limitation, the "Common Stock" and the "Preferred Stock."

"Change of Control" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"<u>Company Capitalization</u>" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) Promised Options;
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing will only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase; and
- Excludes all Converting Securities converting in the Equity Financing.

"<u>Conversion Price</u>" means either: (1) the SAFE Price or (2) the Discount Price, whichever calculation results in a greater number of shares of SAFE Preferred Stock.

"<u>Converting Securities</u>" means this SAFE, all Other SAFEs, convertible promissory notes and other convertible debt instruments and convertible securities that have the right to convert into shares of Capital Stock.

"<u>Direct Listing</u>" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing will not be deemed to be an underwritten offering and will not involve any underwriting services.

"<u>Discount Price</u>" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"<u>Dissolution Event</u>" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary.

"<u>Dividend Amount</u>" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"<u>Equity Financing</u>" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"<u>Initial Public Offering</u>" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"<u>Liquidity Capitalization</u>" is calculated as of immediately prior to the Liquidity Event and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes, to the extent receiving Proceeds, all (i) issued and outstanding Options and (ii) Promised Options;
- Excludes the Unissued Option Pool; and
- Excludes all Converting Securities converting in the Liquidity Event.

"<u>Liquidity Event</u>" means a Change of Control, a Direct Listing, an Initial Public Offering or a SPAC Transaction.

-3-

"Liquidity Price" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"Options" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"Other SAFE" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this SAFE, purchased by investors for the purpose of funding the Company's business operations.

"Proceeds" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"Promised Options" means promised but ungranted Options that are (i) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (ii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"SAFE Preferred Stock" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences, seniority, liquidation multiple and restrictions as the shares of Standard Preferred Stock, except that any price-based preferences (such as the per share liquidation amount, initial conversion price and per share dividend amount) will be based on the Conversion Price.

"SAFE Price" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

"SPAC Transaction" means a transaction in which the Company's Capital Stock is exchanged for or otherwise converted into securities that are publicly listed, or contemplated to be publicly listed pursuant to the transaction governing such exchange or conversion, on a securities exchange, excluding an Initial Public Offering or Direct Listing, but including through a merger, acquisition, business combination or similar transaction, in one transaction or series of related transactions, involving a vehicle commonly known as a special purpose acquisition company (SPAC), reverse merger or otherwise. For purposes of this SAFE, a SPAC Transaction will be treated as an Initial Public Offering unless it constitutes a Change of Control.

"Standard Preferred Stock" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"Unissued Option Pool" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3.     **Company Representations.**

(a)     The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)     The execution, delivery and performance by the Company of this SAFE is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This SAFE constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the

-4-

enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)     The performance and consummation of the transactions contemplated by this SAFE do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)     No consents or approvals are required in connection with the performance of this SAFE, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)     To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.     **Investor Representations.**

(a)     The Investor has full legal capacity, power and authority to execute and deliver this SAFE and to perform its obligations hereunder. This SAFE constitutes a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and the Investor acknowledges and agrees that if the Investor is not an accredited investor at the time of any Equity Financing, the Company may void this SAFE and return the Purchase Amount. The Investor has been advised that this SAFE and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor further understands that the Company is under no obligation to register this SAFE and the underlying securities. The Investor is purchasing this SAFE and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.     **Miscellaneous.**

(a)     Any provision of this SAFE may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of this SAFE together with all then-

outstanding Other SAFEs with the same "Valuation Cap" and "Discount Rate" as this SAFE (and Other SAFEs lacking one or both of such terms will be considered to be the same with respect to such term(s)), provided that with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Other SAFEs must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of this SAFE and Other SAFEs whose instruments have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of instruments.

(b)    Any notice required or permitted by this SAFE will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)    The Investor is not entitled, as a holder of this SAFE, to vote or be deemed the holder of Capital Stock for any purpose other than tax purposes, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein. However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this SAFE is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)    Neither this SAFE nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this SAFE and/or the rights contained herein may be assigned without the Company's consent by the Investor to (i) the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor.

(e)    In the event any one or more of the provisions of this SAFE is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this SAFE operate or would prospectively operate to invalidate this SAFE, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this SAFE and the remaining provisions of this SAFE will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)    All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g)    The parties acknowledge and agree that for United States federal and state income tax purposes this SAFE is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this SAFE consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

163591709.2

(h)     This SAFE may be executed in any number of counterparts, either manually or electronically, each of which when so executed and delivered will be deemed an original, and all of which together will constitute one and the same agreement.

(i)     Investor will not, without the prior written consent of the managing underwriter (if applicable) and the Company, during the period commencing on the date of (a) the final prospectus relating to the Initial Public Offering or Direct Listing or (b) the consummation of a SPAC Transaction, as applicable, and ending on the date specified by the Company and the Company and/or the managing underwriter, as applicable (such period not to exceed 180 days, which period may be extended upon the request of the Company and/or the managing underwriter, to the extent required by any NASD, NYSE or FINRA rules, for an additional period of up to 15 days if the Company issues or proposes to issue an earnings or other public release within 15 days after the expiration of the 180-day period), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock held immediately before the effective date of the registration statement for the Initial Public Offering or Direct Listing or consummation of the SPAC Transaction, as applicable, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Section 5(i) will apply only to the Initial Public Offering, a Direct Listing or a SPAC Transaction, will not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, or the transfer of any shares to any trust for the direct or indirect benefit of the Investor or the immediate family of the Investor, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer does not involve a disposition for value. The underwriters of the Initial Public Offering are intended third party beneficiaries of this Section 5(i) and will have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Investor further agrees to execute such agreements as may be requested by the underwriters (if applicable) and by the Company that are consistent with this Section 5(i) or that are necessary to give further effect thereto.

(j)     Each party to this instrument acknowledges that Perkins Coie LLP ("Perkins"), counsel to the Company, has or may have in the past performed and is or may now or in the future represent one or more investors in securities of the Company or their affiliates in matters unrelated to the transactions contemplated by this instrument (this "Transaction"), including representation of such investors or their affiliates in matters of a similar nature to this Transaction.  The applicable rules of professional conduct require that Perkins inform the parties hereunder of this representation and obtain their consent.  Perkins has served as counsel to the Company and has negotiated the terms of this Transaction solely on behalf of the Company.  The Company and the Investor hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation, (ii) acknowledge that with respect to this Transaction, Perkins has represented solely the Company, and not the Investor or any stockholder, director or employee of the Company or any other investor holding securities of the Company, and (iii) gives its informed consent to Perkins' representation of the Company in this Transaction.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned have caused this SAFE to be duly executed and delivered.

**COMPANY**:

**ABSECON CAPITAL, INC.**

By:_____

Name: Kingsley B. Anderson

Title: President and CEO

Address:_____

_____

Email: braeden@abseconcap.com

**INVESTOR:**

Andrew Montgomery

By:_____
   Andrew Montgomery (Apr 25, 2024 16:04 EDT)

Name: Andrew Montgomery

Title:_____

Address: Investor 1300 4th St. SE #904 Washington DC 20003

_____

Email: bodie.mont@gmail.com

163591709.2

# EXHIBIT 2



**ANDERSON**

**P . C .**

(202) 787-5796
1717 K Street NW, Suite 900
Washington, D.C. 20006
anderpc.com

# NOTICE OF BANKRUPTCY FILING AND AUTOMATIC STAY

Please be advised that Kingsley Braeden Anderson and Selena Gabrielle jointly filed a voluntary petition *Pro Se* for relief under Chapter 13 of the United States Bankruptcy Code on April 24, 2025, in the United States Bankruptcy Court for the District of New Jersey, Trenton Division.

As a result, the automatic stay pursuant to 11 U.S.C. § 362 is now in full force and effect. This automatic stay immediately prohibits you and your agents from:

1. Commencing or continuing any lawsuits or legal proceedings against either debtor,
2. Contacting either debtor regarding any pre-petition debt,
3. Sending bills, making collection calls, emails, texts, or other communications,
4. Enforcing any judgments, garnishments, liens, or collection actions,
5. Taking any steps to repossess or foreclose on any property.

**YOU HAVE BEEN LISTED AS A CREDITOR IN THE BANKRUPTCY SCHEDULES FILED WITH THE COURT. YOU WILL RECEIVE FORMAL NOTICE AND INSTRUCTIONS FROM THE BANKRUPTCY COURT REGARDING HOW TO PROCEED, INCLUDING INSTRUCTIONS ON FILING A PROOF OF CLAIM IF APPROPRIATE.**

For additional information regarding this bankruptcy case, please contact:

**United States Bankruptcy Court**
District of New Jersey – Trenton Vicinage
Clarkson S. Fisher U.S. Courthouse
402 East State Street
Trenton, NJ 08608
Telephone: (609) 858-9333
Website: www.njb.uscourts.gov

Any further attempt to collect a debt, continue litigation, enforce any judgment, or otherwise pursue claims against the Debtors without relief from the automatic stay may constitute a violation of federal law. Violations may subject you to sanctions, including but not limited to actual damages, attorneys' fees, and punitive damages.

Sincerely,
The Debtors

# EXHIBIT 3



OFFERING MEMORANDUM

facilitated by



# Black Turtle Coffee

## FORM C

## OFFERING MEMORANDUM

### Purpose of This Form

A company that wants to raise money using Regulation Crowdfunding must give certain information to prospective investors, so investors will have a basis for making an informed decision. The Securities and Exchange Commission, or SEC, has issued regulations at 17 CFR §227.201 listing the information companies must provide. This form – Form C – is the form used to provide that information.

Each heading below corresponds to a section of the SEC's regulations under 17 CFR §227.201.

### (A) The Company

| | |
|---|---|
| Name of Company | Black Turtle Coffee |
| State of Organization | NJ |
| Date of Formation | 07/20/2021 |
| Entity Type | Limited Liability Company |
| Street Address | 506 Lazy Ln, Absecon NJ, 08201 |
| Website Address | https://www.blackturtlecoffee.com/ |

### (B) Directors and Officers of the Company

| Key Person | Selena Gabrielle |
|---|---|
| Position with the Company<br><br>Title<br>First Year | <br><br>Co-Founder<br>2021 |
| Other business experience<br>(last three years) | *List any other titles and dates of positions held (with this business or other employers)* **during the past three years** *with an indication of job responsibilities. For example:*<br><br>• **Summer Financial Analyst** (Goldman Sachs, June 2021 - August 2021) - Goldman Sachs' provides businesses and individual people with financial expertise and services. I cleaned and analyzed investment data to provide savings for the firm and our clients.<br><br>• **Summer Data Science Intern** (SAP Concur, June 2020 - August 2020) - SAP Concur provides travel and expense management services to businesses. I developed algorithms and provided efficiency and accuracy ratings to clean up our databases.<br><br>• **Summer Data Analysis Intern** (Amazon, June 2020 - August 2020) - Amazon is a multinational technology company that provides e-commerce services, cloud computing, and AI services. I developed and analyzed business expansion opportunities for Amazon during COVID-19. |

| Key Person | Kinglsey Anderson |
|---|---|
| Position with the Company<br><div align="right">Title</div><br><div align="right">First Year</div> | <br>Co-Founder<br>2021 |
| Other business experience (last three years) | • **Associate** (*Sidley Austin, September 2018 - Present*) — Sidley Austin provides high quality services to their clients when dealing with government investigations. Anderson investigates potential legal breaches and protects bank entities. |

**(C) Each Person Who Owns 20% or More of the Voting Power**

| Name of Holder | % of Voting Power (Prior to Offering) |
|---|---|
| Selena Gabrielle | 50% |
| Kinglsey Anderson | 50% |

**(D) The Company's Business and Business Plan**

Business Model

Through our direct-to-consumer, online sales platform, our business will extend far beyond our physical retail location. Nonetheless, our competition in the nearby area consists mainly of fast food vendors such as Wawa, Starbucks, and Dunkin Donuts. We plan on capturing the upper end of the local coffee market by serving gourmet, specially made, self-roasted coffee products at reasonable prices. Our superior atmosphere and great customer service will target, attract, and satisfy sophisticated coffee consumers across the United States.

- The location we have selected has approximately 1,400 square feet of space in a high foot traffic area near the Brigantine Beach, room for an outdoor patio, and requires minimal renovations.
- The space has been vacant for several months and the owner is motivated and has offered a five-year lease at a highly competitive monthly rate
- Approximately 500 square feet of outdoor patio space, with lockup racks for bicycles
- A five-year lease at $1,800/month
- Utilities (water, electricity, gas, internet, phone) are estimated to be $400 per month

Our Story

Whether ordering from our website, or stopping by for a fresh cup, BTC will be the go-to place for coffee lovers. We plan on serving the highest quality coffee, baked goods and snacks in a trendy,

cultured, and comfortable atmosphere. Our convenient location and excellent customer service will build a steady repeat customer base.

- Our gourmet coffee products will be sourced from single origin, fair trade coffee beans from desirable regions located in the "bean belt," such as, Brazil and Columbia.
- These products will include espressos, cappuccinos, lattés, a variety of baked goods and snacks, including healthy and organic alternatives.

The Team

Braeden Anderson, Cofounder

Braeden Anderson is a coffee expert, lawyer, entrepreneur, author, professor, and former college basketball player. He is currently an associate attorney in New York City at Sidley Austin LLP within its Securities Enforcement & Regulatory group, which received the 2019 Chambers USA Award for Financial Services Regulation, and was named the "Law Firm of the Year" for Securities Regulation in 2021 and 2020 by U.S. News – Best Lawyers. Braeden is also the Founder of Arden Grace 17 LLC, a real estate investment company based in Manhattan that owns and manages several rental properties and other real estate assets. Prior to entering law practice, Braeden played basketball for the Fresno State Bulldogs; and then the Seton Hall Pirates where he won the Big East Conference Championship while attending law school. In addition to his legal and entrepreneurial efforts, Braeden also serves as an adjunct professor of business law at Monroe College in the Bronx, New York, and is the Chairman of the Corporate Law Section of the Metropolitan Black Bar Association (MBBA).

Selena Gabrielle, Cofounder

Selena Gabrielle is a coffee enthusiast and financial analyst at Goldman Sachs in the Business Intelligence department. Prior to her work at Goldman Sachs, Selena competed and won first prize in the Zahn Innovation Startup Competition in consecutive years for two companies: ParkBreezy and GoodMD. Other relevant and valuable experience includes positions held at Amazon Web Services and SAP Concur. Selena is proficient in data analytics, financial modeling, computer engineering, and has demonstrated mastery in the following coding languages and programs: C/C++, Python, SQL, Tableau, Alteryx, MATLAB, GraphPad Prism using ANOVAS & SEM.

The Competition

Given the proximity to the beach, bars, restaurants, shopping centers, and a sprawling residential area, our primary target market will be tourists and affluent residents. Both groups are heavy consumers of coffee, tea, snacks, and baked goods. Based on our customer surveys, there is a strong demand for a high-end coffee shop in a central location that serves great coffee and has both outdoor seating and reliable wifi. The three most common complaints about the existing competition are:

- Inconsistent product: Discerning customers are reluctant to become regular patrons of a coffee shop that cannot consistently serve a high-quality product.
- Lack of patio seating: Many people prefer to consume their food and beverages outdoors on a sunny day. Having outdoor space is especially important in light of the COVID-19 pandemic to assure we are able to accommodate our customers in a socially distant environment, if necessary.
- Lack of reliable wifi: The lack of reliable wifi makes it difficult to attract remote workers and students.

The Coffee Industry

According to analysis by Pew Research, millennials have overtaken baby boomers as America's largest living generation. Millennials are more social and mobile than previous generations and prefer to have coffee with friends in trendy, public locations, increasing the popularity of high-end coffee shops. U.S. statistics indicate that:

- Gourmet coffee's popularity is increasing across diverse demographics
- Americans consume more than 400 million cups of coffee per day
- Retail sales of coffee exceed $14.9 billion per year
- Our Position in the Industry. Our business is sure to stand out immediately as the supreme coffee brand in the local area. Brigantine and the surrounding area has a high density of wealthy, established homeowners, college students, and young professionals. This community can afford to spend money on specialty coffees and baked goods and are willing to do so. Our market research has shown that 7 out of 10 people polled in Brigantine consume at least three cups of specialty coffee per week. As our brand continues to grow and gain awareness, our online coffee sales are positioned to take a sizable bite into the market share of major coffee labels

For more information, please refer to the Page View included with this filing.

## (E) Number of Employees

The Company currently has 2 employees. The Company may hire or discharge employees in the future to meet its objectives.

## (F) Risks of Investing

A crowdfunding investment involves risk. **YOU SHOULD NOT INVEST ANY FUNDS IN THIS OFFERING UNLESS YOU CAN AFFORD TO LOSE YOUR ENTIRE INVESTMENT.** In making an investment decision, investors must rely on their own examination of the issuer and the terms of the offering, including the merits and risks involved. Please review the Educational Materials for risks that are common to many of the companies on the MainVest platform.

THESE SECURITIES ARE OFFERED UNDER AN EXEMPTION FROM REGISTRATION UNDER FEDERAL LAW. THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THESE SECURITIES ARE EXEMPT FROM REGISTRATION. THE SEC HAS NOT PASSED UPON THE MERITS OF THE SECURITIES OR THE TERMS OF THE OFFERING, AND HAS NOT PASSED UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENTS OR LITERATURE.

THESE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THESE AUTHORITIES HAVE NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT.

Please refer to Appendix A for additional risks to consider when investing in this offering.

## (G) Target Offering Amount and Offering Deadline

| | |
|---|---|
| Target Offering Amount | $75,000 |
| Offering Deadline | October 29, 2021 |

If the sum of the investment commitments does not equal or exceed the Target Offering Amount as of the Offering Deadline, no securities will be sold in the offering, investment commitments will be canceled, and all committed funds will be returned. The Company may extend the Offering Deadline and shall treat such an extension as a material change to the original offer and provide Investors with notice and opportunity to reconfirm their investment in accordance with Section (K) of this Memorandum.

**(H) Commitments that Exceed the Target Offering Amount**

| | |
|---|---|
| Will the Company accept commitments that exceed the Target Offering Amount? | Yes |
| What is the maximum you will accept in this Offering? | $106,000 |
| If Yes, how will the Company deal with the oversubscriptions? | We will accept subscriptions on a first-come, first-served basis. |

**(I) How the Company Intends to Use the Money Raised in the Offering**

The Company is reasonably sure it will use the money raised in the offering as follows:

| Use | Amount (Minimum) | Amount (Maximum) |
|---|---|---|
| Equipment | $15,000 | $30,000 |
| Supplies | $10,000 | $20,000 |
| Rent | $22,000 | $22,000 |
| Advertising | $10,000 | $14,140 |
| Space Build-Out | $13,500 | $13,500 |
| Mainvest Compensation | $4,500 | $6,360 |
| TOTAL | $75,000 | $106,000 |

The amounts listed estimates and are not intended to be exact description of the Company's expenditures. Exact allocation and use of funds may vary based upon legitimate business expenditures and economic factors.

**(J) The Investment Process**

**To Invest**

- Review this Form C and the Campaign Page
- If you decide to invest, enter an amount and press the Invest button
- Follow the instructions

**TO CANCEL YOUR INVESTMENT**

7

Send an email to info@mainvest.com no later than 48 hours before the Offering Deadline or go to the dashboard for your user account to cancel manually. In your email, include your name and the name of the Company.

### Other Information on the Investment Process

- Investors may cancel an investment commitment until 48 hours prior to the Offering Deadline.
- MainVest will notify investors when and if the Target Offering Amount has been raised.
- If the Company reaches the Target Offering Amount before the Offering Deadline, it may close the offering early if it provides notice about the new Offering Deadline at least five business days before such new Offering Deadline, absent a material change that would require an extension of the offering and reconfirmation of the investment commitment.
- If an investor does not cancel an investment commitment before the 48-hour period before the Offering Deadline, the funds will be released to the Company upon closing of the offering and the investor will receive securities in exchange for his or her investment.

For additional information about the investment and cancellation process, see the Educational Materials.

### (K) Material Changes

In the event the issuer undergoes a material change, the Investor will be notified of such change. The investor will have five (5) business days from the receipt of such notice to reconfirm their investment. IF AN INVESTOR DOES NOT RECONFIRM HIS OR HER INVESTMENT COMMITMENT WITHIN FIVE (5) DAYS OF THE NOTICE OF MATERIAL CHANGE BEING SENT, THE INVESTOR'S INVESTMENT COMMITMENT WILL BE CANCELLED, THE COMMITTED FUNDS WILL BE RETURNED, AND THE INVESTOR WILL NOT BE ISSUED ANY OF THE SECURITIES REFERENCED IN THIS OFFERING.

### Explanation

A "material change" means a change that an average, careful investor would want to know about before making an investment decision. If a material change occurs after you make an investment commitment but before the Offering closes, then the Company will notify you and ask whether you want to invest anyway. If you do not affirmatively choose to invest, then your commitment will be cancelled, your funds will be returned to you, and you will not receive any securities.

### (L) Price of the Securities

The Company is offering "securities" in the form of revenue sharing notes, which we refer to as "Notes." The Notes are being offered at their face amount. For example, you will pay $1,000 for a Note with a face amount of $1,000.

## (M) Terms of the Securities

### Overview

The Company is offering "securities" in the form of revenue sharing notes, which we refer to as the "Notes." The Terms of the Notes are set forth in the Revenue Share Agreement accompanying this Form C in Appendix A. Copies of the Note and Revenue Sharing Agreement are attached to this Form C.

### Summary of Terms

| | |
|---|---|
| Revenue Percentage[1] | 3.0 - 4.2%[2] |
| Payment Deadline | 2028-10-01 |
| Maximum Payment Multiple[3]<br>- Early Investors<br>- All Other Investors | 1.6 x<br>1.5 x |
| Sharing Start Date | The first day after disbursement that the company has revenues greater than one ($1) dollar |
| First Payment Date | The last day of the calendar quarter ending not less than 90 days after the Sharing Start Date |
| Seniority | Subordinated |
| Securitization | Unsecured |
| Accrual Rate | % |

[1] as defined in the note agreement included in Appendix A

[2] The rate of revenue sharing is calculated on a linear scale with a minimum rate of 3.0% and a maximum rate of 4.2% and is rounded to the nearest 1/10th percent. The final rate is based on the amount raised and is calculated after the offering has successfully closed. As the amount raised in the offering increases, the rate of revenue sharing increases. For example, a hypothetical offering could result in the following revenue sharing percentages, depending on the amount raised:

| Amount Raised | Revenue Sharing Percentage |
|---|---|
| $75,000 | 3.0% |
| $82,750 | 3.3% |
| $90,500 | 3.6% |
| $98,250 | 3.9% |
| $106,000 | 4.2% |

[3] To reward early participation, the investors who contribute the first $20,000.0 raised in the offering will receive a 1.6x cap. Investors who contribute after $20,000.0 has been raised in the offering will receive a 1.5x cap.

### Your Right to Payments under the Note

Your right to payments under the Note is set forth in the Note, together with a separate document

called the Revenue Sharing Agreement. Copies of the Note and Revenue Sharing Agreement are attached to this Form C. Additionally, general terms are outlined below and in the Company's offering page.

### Obligation to Contribute Capital

Once you pay for your Note, you will have no obligation to contribute more money to the Company, and you will not be personally obligated for any debts of the Company. However, under some circumstances you could be required by law to return some or all of a distribution you receive from the Company.

### No Right to Transfer

You should plan to hold the Notes until maturity. The Notes will be illiquid (meaning you might not be able to sell them) for at least four reasons:

- The Revenue Sharing Agreement prohibits the sale or other transfer of Notes without the Company's consent.
- If you want to sell your Note the Company will have the first right of refusal to buy it, which could make it harder to find a buyer.
- Even if a sale were permitted, there is no ready market for Notes, as there would be for a publicly-traded stock.
- By law, for a period of one year you won't be allowed to transfer the Investor Shares except (i) to the Company itself, (ii) to an "accredited" investor, (iii) to a family or trust, or (iii) in a public offering of the Company's shares.

### Security

The Notes are not secured by any assets of the Company or any assets of persons associated with the Company.

### Modification of Terms of Notes

The terms of the Notes and the Revenue Sharing Agreement may be modified or amended with the consent of Investors holding 50% of the Notes, measured by the total amount outstanding under each Note.

### Other Classes of Securities

| | |
|---|---|
| Name of Security | Limited Liability Company Interests |
| Number of Shares Outstanding | N/A |
| Describe Voting Rights of These Securities, Including Any Limitations on Voting Rights | N/A |
| How these securities differ from the revenue sharing notes being offered to investors | Limited Liability Company Interests are an equity interest, whereas Revenue Sharing Notes are a debt obligation of the Company. |

### Dilution of Rights

The Company has the right to create additional classes of securities, both equity securities and debt securities (e.g., other classes of promissory notes). Some of these additional classes of securities could have rights that are superior to those of the Notes. For example, the Company could issue promissory notes that are secured by specific property of the Company.

### The People Who Control the Company

Each of these people owns 20% or more of the total voting power of the Company:

| Name of Holder | % of Voting Power (Prior to Offering) |
|---|---|
| Selena Gabrielle | 50% |
| Kinglsey Anderson | 50% |

### How the Exercise of Voting Rights Could Affect You

You will receive payments with respect to your Note only if the Company makes enough money to pay you, or, if the Company does not make enough money to pay you, if there is enough value in the collateral the Company pledged as security for the Notes.

The people with voting rights control the Company and make all the decisions about running its business. If they make good business decisions, it is more likely you will be paid. If they make poor business decisions, it is less likely you will be paid. For example, if they hire too many people and/or try to expand too quickly, the business could be harmed. The people with voting rights could also decide to file for bankruptcy protection, making it more difficult for you to be paid.

### How the Notes are Being Valued

The Notes are being valued at their face value. We don't anticipate that we'll ever need to place a value on the Notes in the future.

### (N) The Funding Portal

The Company is offering its securities through MainVest, Inc., which is a "Funding Portal" licensed by the Securities and Exchange Commission and FINRA. MainVest Inc.'s Central Index Key (CIK) number is 0001746059, their SEC File number is 007-00162, and their Central Registration Depository (CRD) number is 298384.

### (O) Compensation of the Funding Portal

MainVest will be paid 6.0% of the final offering amount, upon the successful completion of the offering. MainVest does not receive compensation if the offering does not succeed. MainVest, Inc. owns no interest in the Company, directly or indirectly, and will not acquire an interest as part of the Offering, nor is there any arrangement for MainVest to acquire an interest.

### (P) Indebtedness of the Company

The Company has no indebtedness outside of the debt the Company is expecting to raise through regulation crowdfunding on MainVest.

## (Q) Other Offerings of Securities within the Last Three Years

The Company has not made any offerings with other third-party regulation crowdfunding companies in the past three years.

## (R) Transactions Between the Company and "Insiders"

The Company has not entered into any business transactions, including stock Purchases, salaries, property rentals, consulting arrangements, guaranties, or other agreements with any individual identified in Section 227.201 (r)(1)-(4) of Regulation Crowdfunding during the 12 months preceding this Offering.

## (S) The Company's Financial Condition

No operating history

Black Turtle Coffee was established in July, 2021. Accordingly, there are limited financial statements and information for investors to review. When evaluating this investment opportunity, investors should consider factors outlined in the risk section as well.

## (T) The Company's Financial Statements

Please see Appendix B for historical financial statements.

### Pro Forma Income Statement

In order to illustrate its future earning potential, the Company has provided a summary of its - year financial forecast. The forecast has been developed by the Company using reasonable best efforts based on their understanding of the industry and market they wish to enter. Please refer to Section (F) of this Offering Memorandum for a list of the risks associated with an investment in the Company and utilizing any pro forma provided by the Company for making investment decisions.

12

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Gross Sales | $685,748 | $768,038 | $844,842 | $903,981 | $949,180 |
| Cost of Goods Sold | $86,066 | $96,393 | $106,032 | $113,454 | $119,126 |
| Gross Profit | $599,682 | $671,645 | $738,810 | $790,527 | $830,054 |
| EXPENSES |  |  |  |  |  |
| Rent | $23,400 | $23,985 | $24,584 | $25,198 | $25,827 |
| Utilities | $4,800 | $4,920 | $5,043 | $5,169 | $5,298 |
| Sales Tax | $45,431 | $46,566 | $47,730 | $48,923 | $50,146 |
| Insurance | $4,629 | $4,744 | $4,862 | $4,983 | $5,107 |
| Equipment | $23,177 | $23,756 | $24,349 | $24,957 | $25,580 |
| Cost of Labor | $35,000 | $35,875 | $36,771 | $37,690 | $38,632 |
| Loan Payments | $8,833 | $9,053 | $9,279 | $9,510 | $9,747 |
| Supplies | $78,419 | $80,379 | $82,388 | $84,447 | $86,558 |
| Cost of User Acquisition | $26,624 | $27,289 | $27,971 | $28,670 | $29,386 |
| Operating Profit | $349,369 | $415,078 | $475,833 | $520,980 | $553,773 |

## (U) Disqualification Events

Neither The Company nor any individual identified by Section 227.503(a) of Regulation Crowdfunding is the subject of a disqualifying event as defined by Section 227.503 of Regulation Crowdfunding.

### Explanation

A company is not allowed to raise money using Regulation Crowdfunding if certain designated people associated with the Company (including its directors or executive officers) committed certain prohibited acts (mainly concerned with violations of the securities laws) on or after May 16, 2016. (You can read more about these rules in the Educational Materials.) This item requires a company to disclose whether any of those designated people committed any of those prohibited acts before May 16, 2016.

## (V) Updates on the Progress of the Offering

To track the investment commitments we've received in this Offering, click to see the Progress Bar.

## (W) Annual Reports for the Company

The Company will file a report with the Securities and Exchange Commission annually and post the report on our website no later than 120 days after the end of each fiscal year. It's possible that at some point, the Company will not be required to file any more annual reports. We will notify

you if that happens.

## (X) Our Compliance with Reporting Obligations

The Company has never raised money using Regulation Crowdfunding before, and therefore has never been required to file any reports.

## (Y) Other Information Prospective Investors Should Know About

The Issuer may offer "Perks" as a means of showing appreciation to investors for supporting small community businesses. The offering of "Perks" by issuers is done purely on a voluntary basis and have no influence upon the terms of the Offering. As such, Investor "Perks" are not contractual conditions governed by "the Note" and are not enforceable under "the Note".

### Additional Information Included in the Form C

|  | Most recent fiscal year-end (tax returns) | Prior fiscal year-end (tax returns) |
|---|---|---|
| Total Assets | $0 | $0 |
| Cash & Cash Equivalents | $0 | $0 |
| Accounts Receivable | $0 | $0 |
| Short-term Debt | $0 | $0 |
| Long-term Debt | $0 | $0 |
| Revenues/Sales | $0 | $0 |
| Cost of Goods Sold | $0 | $0 |
| Taxes Paid | $0 | $0 |
| Net Income | $0 | $0 |

Jurisdictions in which the Company intends to offer the securities:

AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY, B5, GU, PR, VI, 1V

# EXHIBIT 4



# Disrupting the Hospitality Industry

Braeden Anderson



We're building modern companies that deliver top quality products and experiences

ABSECON CAPITAL

2



ABSECON CAPITAL

# Quality Redefined

Absecon Capital is setting new standards.

**Craftsmanship and quality are at the heart of our business philosophy.**

As the parent company of several emerging mid-market leaders in the U.S. food and beverage industry, including Black Turtle Coffee, Kook Burger, Kook Burger & Bar, and Jester Castle, we are dedicated to disrupting and demystifying the industry by delivering superior products and experiences to our customers.

Join us as we continue to drive growth and innovation in the dynamic and constantly evolving world of food and beverage.

3



# ABSECON CAPITAL

Luxury
Coffee

Premium Casual
Dining

Live Music &
Comedy

ABSECON CAPITAL

# Meet the Executive Team



Selena Gabrielle
Co-Founder & CFO



Braeden Anderson
Co-Founder & CEO



Victor Alegria
COO



Brett Hildenbrand
Business Advisor

ABSECON CAPITAL

# Why Now?

- Expanding and raising funds now is about seizing opportunities in the hospitality industry. Our concepts, Kook Burger & Bar, and Black Turtle Coffee, are gaining traction, showing growth potential. People love our unique food and coffee experience.
- The current scene is perfect for expansion, with a rise in interest in the 4th wave of coffee and a preference for fresh dining experiences. Expanding quickly lets us lead in these trends, grabbing market share early.
- Early expansion helps us establish in profitable markets and stay ahead of potential competitors. Raising funds is crucial for this plan—opening new locations, marketing, and strengthening our brand presence. It's about using our momentum, following market trends, and building a solid foundation for ongoing success in the hospitality industry.

6



ABSECON CAPITAL

# Where we are now







Brigantine, NJ

Philadelphia, PA

New York, NY








7



ABSECON CAPITAL

# Where we're going next



Boston, MA



Las Vegas, NV



Atlanta, GA



Chicago, IL



Austin, TX



Miami, FL



Houston, TX



West Palm Beach, FL

8

ABSECON CAPITAL

# Black Turtle Coffee

Specializing in organic, single origin coffee and small batch roasting

9



ABSECON CAPITAL

BLACK TURTLE COFFEE

# Our Collection



### Blueshell
Decaf Dark Roast



### Greenshell
Unroasted



### Blackshell
Dark Roast



### Bombshell
Medium Roast



### Redshell
Light Roast

"Just walking into this place is awesome.
The smell of fresh roasted coffee is fantastic. The space is very clean, cozy and relaxing.
The staff is very friendly and helpful. Most importantly the coffee is great.
Very lucky to have this Black Turtle Coffee in Brigantine!"

**Richard R.**
Philadelphia, PA

10



ABSECON CAPITAL

BLACK TURTLE COFFEE

# We're at the Forefront of the Fourth Wave

- First wave began in the early 1900s with mass production and increased accessibility of coffee

- The second wave emerged in the 1970s–90s and was all about the flavor, variety, and experimentation

- The third wave started in the 2000s with its central tenet being sustainability and ethics, and an emphasis on fair trade and novel brewing techniques

- We're spearheading the fourth wave *right now,* marked by a radical and meticulous focus on freshness, sourcing only high-grade single-origin beans, and daily micro-batch roasting



11



# Breaking Down the Vision



**35%**
**Wholesale**

Supplying and delivering quality coffee to all venues where coffee is poured

**35%**
**Storefronts**

Serving and roasting coffee, creating culture

**20%** Franchising
Expansion and licensing revenue

**10%**
**Subscriptions**

Providing coffee, no matter where you are

# Margins on Top Selling Drinks

| Latte | Drip Coffee | Cold Brew |
|:---:|:---:|:---:|

          

| | | |
|:---:|:---:|:---:|
| Cost: $0.46 | Cost: $0.37 | Cost: $0.37 |
| Price: $5.50 | Price: $4.00 | Price: $5.00 |
| Margin: 92% | Margin: 92% | Margin: 93% |



# Margins on Beans

### Espresso



Cost: $0.02

Price: $3.25

Margin: 99.4%

### Bagged Beans (B2C)



Cost: $2.27

Price: $19

Margin: 88.1%

### Wholesale Beans (B2B)



Cost: $3.05

Price: $11

Margin: 72.3%



# Market size



**$50B**
Retail Market for Coffee

**$30B**
Craft Coffee Space

**$1.5B**
5% of Available Market



# Capex breakdown



| | |
|---|---|
| Equipment | 51,786 |
| Hardware | 4,119 |
| Software | 727 |
| Print Materials | 500 |
| Furniture | 4,859 |
| Décor | 7,325 |
| Food | 2,928 |
| Supplies | 6,369 |
| Signage | 35,000 |
| Build-out | 5,424 |
| Payroll | 8,000 |

■ Total = $127,042

ABSECON CAPITAL

BLACK TURTLE COFFEE

# Sourcing Beans with Care



**The Mogiana Region of Brazil**

It runs along the São Paulo and Minas Gerais border and is home to some of the most consistently sweet and well-structured naturals produced in Brazil.

We hand select lots and process them to create a smooth, clean, highly consistent end-product.

**The Future**

We're working to acquire a specialty coffee farm in Columbia to further improve margins  (the farm consists of 150 coffee trees producing 60,000 kilos per year).

# We Care

**Our meticulous approach to coffee production sets us apart from the competition.**

We work closely with farmers and suppliers to ensure that our beans are ethically sourced, expertly roasted, and consistently high-quality.

Our commitment to sustainability is reflected in every aspect of our operations, from the materials we use to package our products, to our support for local communities and initiatives.



17



ABSECON CAPITAL

# Kook Burger

Specializing in craft burgers, specialty fries, and Shoobie Shakes

18



# The Shakes that made us Famous





"Amazing! Absolutely delicious burgers, fries, onion rings— and the shakes too—it's all delicious. Have gone several times and the burger game here is on point. Great specialty burgers that they will customize however you like. The owner and staff are all super friendly too—absolutely love it—Kook Burger crushes!"

**Jamie S.**
Brigantine, NJ

ABSECON CAPITAL

KOOK BURGER

19

ABSECON CAPITAL

KOOK BURGER

# What the Kook?

**Welcome to Kook Burger & Bar,**
**the place where sports fanatics and foodies unite!**

We are a casual restaurant concept specializing in hand-crafted and made-to-order smash burgers, chicken sandwiches and wings, over-the-top Shoobie Shake® milkshakes, craft beer, truffle fries, poutine, and more.



20

ABSECON CAPITAL

KOOK BURGER

# We have fun taking our food seriously

People are tired of settling for poor quality food in relaxed restaurant concepts.

We know, you don't need white tablecloths to provide first-tier dining experiences.

**So, we brought gourmet food to the casual dining scene. Our chefs carefully curate each and every dish with only the freshest ingredients. We take pride in serving up delicious, fresh food.**

21



# Our Best-Selling Burgers



Kook Burger



Kalifornia Klassic



Garden Goof



The Local



Broski Burger

ABSECON CAPITAL

KOOK BURGER

# Phone Eats First

Kook has gone viral!

In less than 10 months, our Instagram account has reached nearly 140,000 followers. Our posts currently reach over 2 million users per month.

We receive hundreds of request per week to "come to [insert city]." Our marketing strategy focuses on creating a strong social media presence by engaging and collaborating with renowned foodies and influencers to create irresistibly appealing video content. These strategic collaborations have allowed us to sustainably amplify our reach to a vast audience and achieve remarkable growth in a short period of time.





23

# Superior Online Presence





## A WORD FROM CHEF

First off, a big, fat THANK YOU for choosing to chow down with us. We're dead serious about quality. It's not a PowerPoint slide in our kitchen, it's the battle cry.

Now, let's talk about the menu. No, we ain't bothering with those snooty white tablecloths. We're too busy handpicking the freshest, kick-ass ingredients that would make your grandma shed a tear of joy. Who needs those fancy setups when you're dealing with taste bud explosions that make fireworks jealous?

So, just remember, we're not your grandma's Michelin-star joint. We're real, we're loud, and we're damn proud of the culinary punches we're throwing.

*Chef P. Morhalo*
Pryce Morhalo, Executive Chef

# Market Size



**$209B**
Market for Restaurants

**$37B**
Market for Sports Bars

**$1.9B**
5% of Available Market

# Capex



ABSECON CAPITAL

# Become an Absecon Capitalist

participate in our unpriced seed round and reap the rewards

**$5M**

SAFE Offering

(simple agreement for future equity)

**15%**

Discount on Future Equity

**$30mm**

**Valuation Cap**

**~7%**

Offering Size*

*reflecting the post-money percentage of company represented by $5 million offering; assuming a $30mm valuation, and the 15% discount

27

ABSECON CAPITAL

# Use of Funds







## $2.25M

- Expand to 10 new cities
- Subscription growth
- B2B wholesale program
- Upgrade roaster and wholesale facilities

## $2.25M

- Expand to 10 new cities
- Team growth
- Marketing

## $0.50M

- Management team growth
- Administrative costs
- Expansion efforts
- Franchising

28

ABSECON CAPITAL

# Contact our Leaders

## Selena Gabrielle CFO

selena@abseconcap.com

718.414.7734

## Braeden Anderson CEO

braeden@abseconcap.com

640.444.1774

@blackturtlecoffee          @kookburgerco          @kookburgerbar          @jestercastlephilly

29

# EXHIBIT 5



Superior Court of New Jersey

Law Division, Special Civil Part

Atlantic County

EVICTION NOTICE TO TENANTS

___Jim Pham___

Plaintiff/Landlord                                              Docket No. LT- 3668  -24

v.

___Black Turtle Coffee___

Defendant/Tenant

BY ORDER OF THE NEW JERSEY SUPERIOR COURT, SPECIAL CIVIL PART, THE TENANTS OF THIS RENTAL
PREMISES HAVE BEEN EVICTED AND THE LANDLORD HAS BEEN PLACED IN FULL POSSESSION THEREOF.

ANY PERSON(S) FOUND TRESPASSING OR ENTERING THE PREMISES WITHOUT PERMISSION FROM THE
LANDLORD WILL BE TRESPASSING AND MAY BE SUBJECT TO ARREST.

LOCATION OF RENTAL PREMSISES:    3101 Revere Blvd, A , Brigantine, NJ

DATED:   2/20/25

SPECIAL CIVIL PART OFFICER AUTHORIZED TO PERFORM THE EXECUTION OF THE WARRANT OF
REMOVAL:    FRANK BOSCO

IN THE EVENT THE TENANT(S) FAIL TO VACATE OR RE-ENTERS THE PREMISES AFTER THE WARRANT OF
REMOVAL HAS BEEN EXECUTED BY THE SPECIAL CIVIL PART OFFICER, THE POLICE IN THIS MUNICIPALITY
WILL BE CONTACTED BY THE LANDLORD AND WILL BE REQUESTED AND AUTHORIZED TO PROVIDE
ASSISTANCE TO REMOVE THE TENANTS FROM THESE RENTAL PREMISES, PER THE ATTACHED WARRANT
OF REMOVAL ISSUED BY THIS COURT

# EXHIBIT 6

off



Superior Court of New Jersey

Law Division, Special Civil Part

Atlantic County

EVICTION NOTICE TO TENANTS

_____Jim Pham_____

Plaintiff/Landlord

Docket No. LT- 3669 -24

v.

_____Kook Burger_____

Defendant/Tenant

BY ORDER OF THE NEW JERSEY SUPERIOR COURT, SPECIAL CIVIL PART, THE TENANTS OF THIS RENTAL PREMISES HAVE BEEN EVICTED AND THE LANDLORD HAS BEEN PLACED IN FULL POSSESSION THEREOF.

ANY PERSON(S) FOUND TRESPASSING OR ENTERING THE PREMISES WITHOUT PERMISSION FROM THE LANDLORD WILL BE TRESPASSING AND MAY BE SUBJECT TO ARREST.

LOCATION OF RENTAL PREMSISES:    3101 Revere Blvd, B , Brigantine, NJ

DATED:    2/20/25

SPECIAL CIVIL PART OFFICER AUTHORIZED TO PERFORM THE EXECUTION OF THE WARRANT OF REMOVAL:    FRANK BOSCO

IN THE EVENT THE TENANT(S) FAIL TO VACATE OR RE-ENTERS THE PREMISES AFTER THE WARRANT OF REMOVAL HAS BEEN EXECUTED BY THE SPECIAL CIVIL PART OFFICER, THE POLICE IN THIS MUNICIPALITY WILL BE CONTACTED BY THE LANDLORD AND WILL BE REQUESTED AND AUTHORIZED TO PROVIDE ASSISTANCE TO REMOVE THE TENANTS FROM THESE RENTAL PREMISES, PER THE ATTACHED WARRANT OF REMOVAL ISSUED BY THIS COURT

# EXHIBIT 7

**COSTELLO, MAINS & SILVERMAN, LLC**
By: Miriam S. Edelstein
Attorney I.D. No. 037612006
18000 Horizon Way, Suite 800
Mount Laurel, NJ 08054
(856) 727-9700
medelstein@costellomains.com
Attorneys for Plaintiff

---

| | | |
|---|---|---|
| JUAN SILVA RODRIGUEZ, | : | SUPERIOR COURT OF NEW JERSEY |
| | : | ATLANTIC COUNTY - LAW DIVISION |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| vs. | : | |
| | : | |
| ABSECON CAPITAL, INC.; KOOK | : | DOCKET NO: |
| BURGER AND BAR LLC; BLACK | : | |
| TURTLE COFFEE LLC; K. BRAEDEN | : | |
| ANDERSON; and JOHN DOES 1-5 AND | : | **COMPLAINT AND JURY DEMAND** |
| 6-10, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

Plaintiff, Juan Silva Rodriguez, currently residing in Miami, Florida, by way of

Complaint against the Defendants, says:

<u>Preliminary Statement</u>

This matter is opened to the Court pursuant to the New Jersey Wage and Hour Law

("NJWHL") alleging failure to pay for all hours worked, including minimum and overtime

wages, as well as the New Jersey Wage Payment Law ("NJWPL") alleging failure to pay all

earned wages at the time such wages were due and owing, and under the New Jersey

Conscientious Employee Protection Act ("CEPA") for retaliation after Plaintiff engaged in

protected conduct as further set forth below.

**Identification of Parties**

1.      Plaintiff Juan Silva Rodriguez ("Plaintiff"), currently residing in Miami, Florida,
at all times relevant herein, is a former resident of the State of New Jersey and a former
employee of the Defendants.

2.      Defendant Absecon Capital, Inc. ("Absecon") is, at all relevant times herein, an
entity doing business in the State of New Jersey at 506 Lazy Lane, Absecon, New Jersey 08201,
and is the former employer of Plaintiff.

3.      Defendant Kook Burger and Bar LLC ("KBB") is, at all relevant times herein, an
entity doing business in the State of New Jersey with a registered agent for service of process
located at 506 Lazy Lane, Absecon, New Jersey 08201, and the former employer of Plaintiff.

4.      Defendant Black Turtle Coffee LLC ("BTC") is, at all relevant times herein, an
entity doing business in the State of New Jersey with a registered agent for service of process
located at 506 Lazy Lane, Absecon, New Jersey 08201, and the former employer of Plaintiff.

5.      Defendant K. Braeden Anderson ("Anderson") is, at all relevant times herein, the
Co-Founder and Chief Executive Officer ("CEO") of Absecon, and is liable to Plaintiff for his
own direct acts and/or on the basis of *respondeat superior* under the NJWHL, NJWPL and
CEPA as further set forth herein.

6.      Defendants KBB and BTC are each the same as and/or part of the same joint
enterprise as and/or are "corporate *alter egos*" of Absecon in that they share the same principals,
officers, and/or owners and operate pursuant to the same organizational and/or operational
agreements.

7. Defendants John Does 1-5 and 6-10, currently unidentified, are individuals and/or entities who, on the basis of their direct acts or on the basis of *respondeat superior*, are answerable to the Plaintiff for the acts set forth herein.

### General Allegations

8. In or around August 2023, Plaintiff met with Anderson and Absecon's Chief Operations Officer ("COO"), Victor Algria ("Algria"), to discuss potential employment with Absecon.

9. At the time, Plaintiff was employed at a country club in Mississippi, but traveled to New Jersey to meet with Anderson and Algria to discuss the employment opportunity.

10. During this meeting, Anderson asked Plaintiff not to return to Mississippi, and instead, to leave his job and start working immediately for Defendants, managing BTC's operations at 3101 Revere Boulevard, Brigantine, New Jersey.

11. Anderson told Plaintiff that Defendants would not be able to pay Plaintiff for the first few months he was employed, but that Defendants would sponsor Plaintiff's immigration visa and that Plaintiff's food and housing expenses would be covered during this time, with Plaintiff able to stay without paying rent in Anderson's condominium located in Brigantine.

12. Plaintiff, a Columbian citizen, agreed, with the understanding that he would start receiving wages within a maximum of three (3) months as well as have an employer-sponsored visa or one in process through Defendants.

13. Accordingly, Plaintiff resigned his employment with the country club in Mississippi and began working for Defendants on or about August 20, 2023.

14.     Anderson engaged the firm Loigica, P.A., located in Miami, Florida, in or around October 2023 to begin the employer-sponsored visa process for Plaintiff, advising that it would cost a total of $24,000 and take up to two (2) years to complete.

15.     In or around November 2023, however, Plaintiff was still not receiving any wages, despite working between 70-80 hours per week on average.

16.     In addition, Plaintiff's family had moved to join him, requiring Plaintiff to find a different housing situation, as Anderson's condominium was not large enough to accommodate Plaintiff's family.

17.     Plaintiff's savings had been depleted during the time he was not receiving wages while working for Defendants, and now he had to pay rent in addition to his other expenses.

18.     Plaintiff asked Anderson to start paying Plaintiff his wages, but Anderson told Plaintiff that he could not pay him because business was slow.

19.     Plaintiff asked Anderson again on or about December 15, 2023, to start paying Plaintiff his wages, reminding Anderson that Plaintiff was no longer getting his housing expenses covered, but Anderson again said no, that it was still a slow season for the business.

20.     In or around mid-January 2024, Plaintiff again followed up with Anderson to ask about his wages, and Anderson directed Plaintiff to Algria, who told Plaintiff that Defendants could not afford to pay him at that time.

21.     Shortly thereafter, the Loigica firm contacted Plaintiff and advised that they had not received any payment for the visa process since December 2023.

22.     On or about January 23, 2024, Plaintiff contacted Absecon's Chief Financial Officer ("CFO") Selena Gabrielle ("Gabrielle"), who had been responsible for ensuring the firm was paid.

23.     Gabrielle advised Plaintiff that the money was in Defendants' Accounts Payable and she would take care of it.

24.     On or about February 5, 2024, the Loigica firm advised Plaintiff advising that no payment had been made.

25.     Plaintiff contacted Gabrielle again regarding the non-payment, and Gabrielle advised Plaintiff, "It's on my radar."

26.     When the Loigica firm continued to advise that no payment had been received, Plaintiff followed up with Anderson about the non-payment to the firm handling the visa process.

27.     Anderson then informed Plaintiff that the company was focused on other things at the moment and trying to grow with further discussions with investors.

28.     In or around mid-February 2024, Plaintiff advised Algria that Defendants needed to pay Plaintiff his wages by March 2024, particularly now that Defendants were not even paying for the visa process, or Plaintiff would need to resign as he could not continue working up to 80 hours per week for free.

29.     Algria relayed Plaintiff's demand to Anderson.

30.     Defendants' failure to pay Plaintiff for all hours worked on regularly scheduled payroll dates at such time his wages were due and owing violated Plaintiff's rights under the NJWHL as well as NJWPL.

31.     Since Defendants were not paying Plaintiff on a salary basis, Plaintiff was entitled to at least the applicable minimum hourly rate for each hour worked up to forty (40) in one week, and to the applicable minimum overtime rates for each hour worked above forty (40) in one week.

32.     Plaintiff's objections to working for Defendants without receiving his wages at the time they were due and owing constituted protected activity under CEPA.

33.     In or around March 2024, following Plaintiff's objections to continuing to work without pay, Anderson began to retaliate against Plaintiff by demanding Plaintiff perform additional work for Absecon's other business, KBB.

34.     In addition, Anderson began accusing Plaintiff of serious performance issues that Anderson claimed Plaintiff would need to address if Plaintiff wanted to continue employment with Defendants.

35.     Anderson further incorrectly informed Plaintiff that Plaintiff was not entitled to wages for his work up to that point because Plaintiff had "agreed" that it would be an unpaid internship in exchange for Defendants sponsoring Plaintiff's visa and for the housing Plaintiff stayed in for the first few months of his employment.

36.     On or about March 19, 2024, Plaintiff resigned from his employment, reiterating that he could not continue working without wages.

37.     As a result of Defendants' conduct described above, Plaintiff has suffered both economic and non-economic harm, including emotional pain and suffering.

38.     Anderson is an attorney managing his own law firm, Anderson P.C., who advertises that he is admitted to practice law in both New York and Washington, D.C., who formerly practiced as an attorney with the large, corporate firms Kirkland & Ellis and Sidley Austin, with "experience as General Counsel to over a dozen start-ups and a private equity firm" and provides "strategic counsel on corporate governance, capital-raising, tokenization, and innovative structuring."[1]

---

[1]     Quotations from the website URL address "https://anderpc.com/leadership" (K. Braeden Anderson, Principal Attorney — Anderson P.C.) as of February 3, 2025.

39.     Because the conduct alleged above violated Plaintiff's rights, and was undertaken by Defendants' upper management with willful, knowing and/or in reckless disregard for Plaintiff's rights, and because the conduct was especially egregious or malicious, punitive damages are warranted under CEPA.

40.     In addition, Defendants are liable for liquidated damages in the amount of 200% of all wages Plaintiff earned for all hours worked which were not paid at the time such wages were due and owing under both the NJWHL and NJWPL.

## COUNT I

### NJWHL Violation – Failure to Pay Minimum Regular Wages For All Hours Worked

41.     Plaintiff hereby repeats and re-alleges paragraphs 1 through 40, as though fully set forth herein.

42.     Based on the facts stated above, Defendants violated the NJWHL by failing to pay Plaintiff at least the applicable minimum hourly rate required for all hours worked up to forty (40) in one week.

43.     As a result of Defendants' acts, Plaintiff has suffered economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgement;

a.   Declaring that the acts and practices complained of herein are in violation of the NJWHL;

b.   Directing Defendants to make Plaintiff whole for all unpaid minimum hourly wages due for all hours worked up to forty (40) in one week, together with interest thereon from the date(s) such wages were due but unpaid;

c.   Directing Defendants to pay liquidated damages in an amount equal to 200% of such unpaid wages;

    d.   Awarding Plaintiff the cost of this action together with reasonable attorneys' fees, and

    e.   Granting such other and further relief as this Court deems necessary and proper.

<div align="center">

**COUNT II**

**<u>NJWHL Violation – Failure to Pay for All Hours Worked</u>**

</div>

44.    Plaintiff hereby repeats and re-alleges paragraphs 1 through 43, as though fully set forth herein.

45.    As stated above, Plaintiff regularly worked in excess of forty (40) hours per week for which work Defendants were not paying Plaintiff on a salary basis.

46.    Accordingly, Plaintiff was not exempt from the overtime requirements of the NJWHL for all hours worked above forty (40) in one week.

47.    Defendants failed to pay Plaintiff any required overtime wages for hours worked above forty (40) in one week.

48.    As a result of Defendants' acts, Plaintiff has suffered economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgement;

    a.   Declaring that the acts and practices complained of herein are in violation of the NJWHL;

    b.   Directing Defendants to make Plaintiff whole for all unpaid overtime wages due for all hours worked above forty (40) in one week, together with interest thereon from the date(s) such wages were due but unpaid;

    c.   Directing Defendants to pay liquidated damages in an amount equal to 200% of the unpaid overtime wages;

d.  Awarding Plaintiff the cost of this action together with reasonable attorneys'
fees, and

e.  Granting such other and further relief as this Court deems necessary and
proper.

## COUNT III

**Violation of the NJWPL – Failure to Make Timely Payment for All Hours Worked**

49.  Plaintiff hereby repeats and re-alleges paragraphs 1 through 48, as though fully
set forth herein.

50.  As stated above, Defendants failed to pay Plaintiff regular wages due and owing
at such time as those wages were due and owing, on regularly payroll dates, in violation of the
NJWPL.

51.  As a result of Defendants' acts, Plaintiff has suffered economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment;

a.  Declaring that the acts and practices complained of herein are in violation of
the NJWPL;

b.  Directing Defendants to make Plaintiff whole for all earned but unpaid wages
together with interest thereon from the date(s) such wages were due but
unpaid;

c.  Directing Defendants to pay liquidated damages in an amount equal to 200%
of the unpaid wages;

d.  Awarding the Plaintiff the costs of this action together with reasonable
attorneys' fees, and

e.   Granting such other and further relief as this Court deems necessary and
proper.

## COUNT IV

### CEPA - Retaliation

52.   Plaintiff hereby repeats and re-alleges paragraphs 1 through 51, as though fully
set forth herein.

53.   In retaliation for Plaintiff objecting to continuing to work for Defendants without
pay, Defendants ceased payment to the firm handling Plaintiff's visa application, demanded
Plaintiff perform additional work with no compensation and accused Plaintiff of performance
issues which they asserted must be corrected for Plaintiff to continue his employment.

54.   Defendants thereby unlawfully retaliated against Plaintiff for engaging in CEPA-
protected activity such that they are liable to him under CEPA.

WHEREFORE, the Plaintiff demands judgment against the Defendants jointly, severally
and in the alternative, together with economic and non-economic compensatory damages,
punitive damages, interest, costs of suit, attorneys' fees, enhanced attorneys' fees, equitable back
pay and any other relief the Court deems equitable and just.

## COUNT V

### Request for Declaratory and Equitable Relief

55.   Plaintiff hereby repeats and re-alleges paragraphs 1 through 54, as though fully
set forth herein.

56.   In addition to the judgment and relief requested above, Plaintiff requests the
following declaratory and equitable remedies and relief in this matter:

a.  Plaintiff requests a declaration by the Court that the practices contested herein violate New Jersey law as set forth herein;

b.  Plaintiff requests that the Court order the Defendants to cease and desist engaging in the unlawful conduct alleged herein going forward, both as to the specific Plaintiff and as to all other individuals similarly situated;

c.  Plaintiff requests equitable back pay for all wages due but unpaid together with interest thereon from the date such wages were due but unpaid;

d.  Plaintiff requests that the Court equitably order the Defendants to pay all costs incurred by Plaintiff and/or his attorneys in connection with this litigation and all of Plaintiff's reasonable attorneys' fees along with statutory and required enhancements to said attorneys' fees;

e.  Plaintiff requests that the Court order the Defendants to publish all required notices under the NJWHL, NJWPL and CEPA to all employees and to have all personnel undergo and complete initial training within 90 days of the Court's order, and thereafter annual training and/or onboarding of any new employees, on the prevention of employment practices prohibited by the NJWHL, NJWPL and CEPA, and to require that such training be conducted by an independent consultant with specific expertise in such training and prevention and who is not otherwise employed by or in any way in a contractual relationship with Defendants;

f.  Plaintiff requests that the Court order the Defendants to furnish proof of the publication of the policies and notices above as well as completion of the initial training to Plaintiff's counsel within 120 days of such order; and

g.  Plaintiff requests that the Court do such other equity as is reasonable, appropriate and just.

WHEREFORE, Plaintiff demands judgment against the Defendants jointly, severally and in the alternative, together with economic and non-economic compensatory damages, liquidated damages, punitive damages, declaratory relief and equitable relief to include back pay, interest, costs of suit, attorneys' fees, enhanced attorneys' fees, and any other relief the Court deems equitable and just.

**COSTELLO, MAINS & SILVERMAN, LLC**

**By:  /s/ Miriam S. Edelstein**

Dated: February 5, 2025

**Miriam S. Edelstein**

## DEMAND TO PRESERVE EVIDENCE

1.      All Defendants are hereby directed and demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to Plaintiff's cause of action and/or prayers for relief, to any defenses to same, and pertaining to any party, including, but not limited to, electronic data storage, closed circuit TV footages, digital images, computer images, cache memory, searchable data, emails, spread sheets, employment files, memos, text messages and any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, twitter, MySpace, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

2.      Failure to do so will result in separate claims for spoliation of evidence and/or for appropriate adverse inferences.

**COSTELLO, MAINS & SILVERMAN, LLC**

By: __*/s/ Miriam S. Edelstein*_____
        **Miriam S. Edelstein**

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**COSTELLO, MAINS & SILVERMAN, LLC**

By: __*/s/ Miriam S. Edelstein*_____
        **Miriam S. Edelstein**

**<u>RULE 4:5-1 CERTIFICATION</u>**

1.      I am licensed to practice law in New Jersey and am responsible for the captioned matter.

2.      I am aware of no other matter currently filed or pending in any court in any jurisdiction which may affect the parties or matters described herein.

         **COSTELLO, MAINS & SILVERMAN, LLC**

**By:**   *<u>/s/ Miriam S. Edelstein</u>*
           **Miriam S. Edelstein**

**<u>DESIGNATION OF TRIAL COUNSEL</u>**

Miriam S. Edelstein, Esquire, of the law firm of Costello, Mains & Silverman LLC, is hereby-designated trial counsel.

         **COSTELLO, MAINS & SILVERMAN, LLC**

**By:**   *<u>/s/ Miriam S. Edelstein</u>*
           **Miriam S. Edelstein**

14

# Civil Case Information Statement

## Case Details: ATLANTIC | Civil Part Docket# L-000233-25

**Case Caption:** SILVA RODRIGUEZ JUAN  VS ABSECON
CAPITAL, INC .

**Case Initiation Date:** 02/05/2025

**Attorney Name:** MIRIAM S EDELSTEIN

**Firm Name:** COSTELLO MAINS & SILVERMAN, LLC

**Address:** 18000 HORIZON WAY STE 800
MT LAUREL NJ 080544319

**Phone:** 8567279700

**Name of Party:** PLAINTIFF : SILVA RODRIGUEZ, JUAN

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE
PROTECTION ACT (CEPA)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by:** JUAN SILVA RODRIGUEZ?
NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/05/2025
Dated

/s/ MIRIAM S EDELSTEIN
Signed

# EXHIBIT 8

**RAYMOND J. NOONAN, LLC ID# 009311985**
**170 Worth Street**
**Brick, New Jersey 08724**
**Telephone (732)202-7885**
**Our File NO: 2025-00106-0**

| | |
|---|---|
| Frankel and Rubinson | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION - ATLANTIC COUNTY |
| vs. | |
| Absecon Capital and Black Turtle Coffee LLC | Docket No. : |
| Defendant(s), | |
| | COMPLAINT (ON CONTRACT) |

Plaintiff(s) Frankel and Rubinson, whose principal place of business is located at 199 Edgewood Ave, Suite C. West Berlin, NJ 08091.

First Count: There is due from the defendant(s) the sum of $32,310.81 on a certain book account, a true copy of which is annexed hereto. Payment has been demanded and has not been made.

Second Count: The plaintiff(s) sue(s) the defendant(s) for the reasonable value for goods sold and delivered, and/or services rendered by the plaintiff(s) to the defendant(s) upon the promise by the defendant(s) to pay the agreed amount as set forth in Schedule "A" annexed hereto. Payment has been demanded and has not been made.

Third Count: The plaintiff(s) sue(s) the defendant(s) for reasonable value for goods sold and delivered, and/or services rendered by the plaintiff(s) to the defendant(s) upon the promise of the defendants(s) to pay a reasonable price for the same, as set forth in Schedule "A" annexed hereto. Payment has been demanded and has not been made.

Fourth Count: The defendant(s), being indebted to the plaintiff(s) in the sum of $32,310.81 upon an account stated between them, did promise to pay the plaintiff(s) said sum upon demand. Payment has been demanded and has not been made.
WHEREFORE Judgment is demanded for $32,310.81 together with lawful interest, late fees, statutory and contractual attorney's fees and cost of suit.

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action, R. 4:5-1. I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated: January 26, 2025

Raymond J. Noonan, LLC.

BY: _____
Raymond J. Noonan, Esq.
Attorney for Plaintiff

# Civil Case Information Statement

## Case Details: ATLANTIC | Civil Part Docket# L-000168-25

**Case Caption:** FRANKEL AND ROBINSON   VS ABSECON
CAPITAL AND  BL

**Case Initiation Date:** 01/27/2025

**Attorney Name:** RAYMOND J NOONAN

**Firm Name:** RAYMOND J. NOONAN, LLC

**Address:** 170 WORTH STREET

BRICK NJ 087240000

**Phone:** 7322027885

**Name of Party:** PLAINTIFF : Frankel and Robinson

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION

**Document Type:** Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Frankel and Robinson? NO**

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**


**Do you or your client need any disability accommodations?** NO
   **If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO
   **If yes, for what language:**


**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO
**Medical Debt Claim?** NO


I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>01/27/2025</u>
Dated

<u>/s/ RAYMOND J NOONAN</u>
Signed

# EXHIBIT 9

**SALDUTTI LAW GROUP**
Thomas B. O'Connell, Esquire-031102008
Robert L. Saldutti, Esquire-006871992
1040 N. Kings Highway, Suite 100
Cherry Hill, NJ 08034
(856) 779-0300
ATTORNEYS FOR PLAINTIFF/49121

| | |
|---|---|
| INTERSTATE OUTDOOR ADVERTISING. LP,<br><br>          Plaintiff,<br><br>v.<br><br>BLACK TURTLE COFFEE, LLC, KINGSLEY B ANDERSON A/K/A KINGSLEY BRAEDEN ANDERSON AND SELENA K GABRIELLE<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>ATLANTIC COUNTY<br><br>DOCKET NO. L-1185-24<br><br>          Civil Action<br><br>**FINAL JUDGMENT BY DEFAULT AND TAXING OF COSTS** |

THIS MATTER coming before the court by Thomas B. O'Connell, Esquire, from the Saldutti Law Group, appearing on behalf of the Plaintiff and it appearing that a Complaint was filed in this matter and that the Defendants were served with the Summons and Complaint and it further appearing that no Answer or appearance has been entered on behalf of the Defendants and that the time within which to file a responsive pleading having past and default having been entered and proper notice having been given pursuant to R.4:43-2(d) and other good cause having been shown;

IT IS on ____11th__ day of __April_____, 20 _25__, ORDERED that judgment be and hereby is entered against the Defendants, Kingsley B. Anderson a/k/a Kingsley Braeden Anderson and Selena K. Gabrielle, and in favor of the Plaintiff, Interstate Outdoor Advertising. LP, in the amount of **$18,790.15**, together with contractual attorney's fees in the amount of **$6,257.12**, and court costs in the amount of **$400.00**, and _____ a total of **$25,487.27**.

Michelle M. Smith, Esq.
Clerk of Superior Court

# EXHIBIT 10

# Become an Absecon Capitalist

Participate in our unpriced seed round and reap the rewards

**$5M**

SAFE Offering

(simple agreement for future equity)

**15%**

Discount on Future Equity

**$30mm**

Valuation Cap

**~7%**

Offering Size*

*reflecting the post-money percentage of company represented by $5 million offering; assuming a $30mm valuation, and the 15% discount

# How We Plan to Use the Capital Injection

$5 Million Total Monetary Raise









**$2M**

- Expand to New York
- Subscription launch
- Equipment
- Team growth

**$1.75M**

- Expand to New York
- Team growth
- Equipment
- Marketing

**$.50M**

- Securing top talent
- Promotion
- Team growth
- Speaker system upgrades

**$.75M**

- Team growth
- Administrative costs
- Expansion efforts

# The Absecon Capital Takeover



| Q4 2021 | Q1 2022 | Q1 2023 | Q2 2023 | Q2 2023 |
|---|---|---|---|---|
| Opened Black Turtle Coffee | Opened Kook Burger | Opened Kook Burger & Bar | Open Black Turtle Coffee | Open Jester Castle |
| Brigantine | Brigantine | Philadelphia | Philadelphia | Philadelphia |

## Braeden Anderson
### Co-Founder & CEO

Braeden Anderson's journey is a fusion of dynamic leadership, law, and business acumen. Having thrived at global legal giants like Kirkland & Ellis LLP and Sidley Austin LLP, Braeden tackled complex challenges for major companies and institutions, excelling under pressure.

Notably, Braeden's influence extended to the cutting-edge realm of financial technology. As the Assistant General Counsel of Regulatory at Robinhood Markets, Inc., he deftly navigated intricate regulations, contributing significantly to the company's compliance and success.

Braeden's journey reshapes the food and beverage landscape. His diverse experiences and unwavering drive fuel the success of Absecon Capital and its subsidiaries. After dedicating his energies to Robinhood, Braeden now focuses full-time on propelling Absecon Capital, demonstrating his unyielding commitment to success. He embodies grit, determination, and visionary leadership.



ABSECON CAPITAL

# Selena Gabrielle
## Co-Founder & CFO

Selena Gabrielle, co-founder and head of finance and operations at Absecon Capital and its subsidiaries, brings a wealth of experience from her previous roles at Goldman Sachs, Amazon Web Services, and SAP Concur. She is an expert in data analytics, financial modeling, and computer engineering, proficient in multiple coding languages such as C/C++, Python, and SQL.

Prior to co-founding Absecon Capital, Selena won first prize in the Zahn Innovation Startup Competition for two consecutive years with her companies, ParkBreezy and GoodMD. She is a natural leader who inspires and motivates those around her, with a passion for excellence and commitment to putting consumers first.

Selena's strategic thinking and technical expertise have helped Absecon Capital make informed decisions and stay ahead of the competition. Her talents and entrepreneurial spirit make her a driving force in our company's success.



ABSECON CAPITAL

# Victor Alegria
## General Manager

Victor Alegria brings over 15 years of invaluable experience in the hospitality industry to our team. He has a proven track record of delivering exceptional customer service, managing teams, and ensuring the smooth operation of various hospitality establishments.

Victor's expertise was honed during his tenure as a General Manager for Laundry's several concepts, one of the world's largest hospitality companies led by renowned entrepreneur Tilman Fertitta (and owner of Houston Rockets). Landry's owns and operates more than 600 restaurants, hotels, casinos and entertainment destinations.

As part of our team, Victor brings an incredibly important piece to the puzzle with his industry experience. Victor has a deep understanding of what it takes to succeed in a fast-paced, customer-focused environment, and he is committed to delivering the best possible experience to our customers. With his knowledge of the hospitality industry and his commitment to excellence, Victor is helping to drive the success of Absecon Capital and its



General Manager for Laundry's for several concepts, one of the world's largest hospitality companies led by renowned entrepreneur Tilman Fertitta (and owner of Houston Rockets). Landry's owns and operates more than 600 restaurants, hotels, casinos and entertainment destinations.

As part of our team, Victor brings an incredibly important piece to the puzzle with his industry experience. Victor has a deep understanding of what it takes to succeed in a fast-paced, customer-focused environment, and he is committed to delivering the best possible experience to our customers. With his knowledge of the hospitality industry and his commitment to excellence, Victor is helping to drive the success of Absecon Capital and its concepts.



ABSECON CAPITAL

# Contact us

## Selena Gabrielle
## CFO
selena@abseconcap.com
718.414.7734

## Braeden Anderson
## CEO
braeden@abseconcap.com
640.444.1774

@blackturtlecoffee        @kookburgerco        @kookburgerbar        @jestercastlephilly

# Absecon Capital Investor Interest Form

We appreciate your interest in Absecon Capital. Kindly take a moment to provide us with some essential details to better understand your investment preferences and goals. Your information will be kept confidential and used solely for communication related to potential investment opportunities.



* Indicates required question

Email *

Your email

**Full Name:** [Your Full Name] *

Your answer

**Investor Bio:** [Briefly describe your background] *

Your answer

**Investment Amount Range:** [Choose One] *

Your answer
_____

**Investment Amount Range:** [Choose One] *

○ $50,000 (minimum)

○ $50,000 – $100,000

○ $100,000 – $500,000

○ $500,000 – $1,000,000

○ Over $1,000,000

○ Other: _____

**Investor Status:**                                                    *

An accredited investor refers to an individual who meets specific financial requirements that make them eligible to invest in certain securities that are not registered with financial authorities. To qualify as an accredited investor, you must meet at least one of the following criteria:

**Net Worth:** Your individual net worth, or combined net worth with your spouse, exceeds $1 million. This calculation excludes the value of your primary residence.

**Income:** You have had an individual income exceeding $200,000 in each of the past two years, or joint income with your spouse exceeding $300,000 in each of those years, and you expect to maintain a similar income level in the current year.

○ Accredited Investor

○ Not Sure / Prefer Not to Disclose

○ Not an Accredited Investor

An accredited investor is an individual who meets specific requirements that make them eligible to invest in certain securities that are not registered with financial authorities. To qualify as an accredited investor, you must meet at least one of the following criteria:

**Net Worth:** Your individual net worth, or combined net worth with your spouse, exceeds $1 million. This calculation excludes the value of your primary residence.

**Income:** You have had an individual income exceeding $200,000 in each of the past two years, or joint income with your spouse exceeding $300,000 in each of those years, and you expect to maintain a similar income level in the current year.

○ Accredited Investor

○ Not Sure / Prefer Not to Disclose

○ Not an Accredited Investor

**Investment Horizon:** [Choose One] *

○ Short-term (1–3 years)

○ Medium-term (3–5 years)

○ Long-term (5+ years)

**Investment Experience:** [Choose One] *

○ New to Investing

○ Limited Experience

○ Experienced Investor